UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NORTHSIDE CHIROPRACTIC, INC., and MICHAEL DUBICK, for themselves and others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | No. 09 CV 04468 |
| v. | ) ) | Judge Edmond E. Chang |
| YELLOWBOOK, INC., formerly known as Yellow Book Sales and Distribution Company, Inc., | ) ) ) ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

Plaintiff Dr. Michael Dubick, as a proposed class representative, has sued Defendant Yellowbook, Inc.[1] Dubick seeks damages based on common law breach of contract and on the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. Dubick has filed a motion for class certification [R. 120]. For the reasons explained below, the motion is denied.

## I.

In August 2005, Dr. Michael Dubick, an officer and shareholder of Northside Chiropractic, was approached by sales representatives from Yellowbook, a company that publishes telephone directories. R. 147 ¶ 21. The salespeople brought with them a clipping of an advertisement for Northside they found in the Lakeview Telephone

---

[1]Citation to the docket is "R." followed by the docket entry. The Court has subject matter jurisdiction under the Class Action Fairness Act because the parties are of diverse citizenship and the matter in controversy exceeds $5 million. 28 U.S.C. § 1332(d).

Directory, and promised Dubick that Yellowbook could print a far superior advertisement. *Id*. ¶¶ 21-23. The Lakeview advertisement included:

(a)    Dr. Dubick's name.

(b)    Dr. Dubick's picture.

(c)    The logo for Northside Chiropractic.

(d)    The statements "Evening and Weekend Hours," "Insurance & Credit Cards Welcome," and "Convenient Safe Location."

(e)    The statements "Patients who regularly visit Northside Chiropractic feel healthier," and "Dr. Dubick delivers a compassionate, personal approach to your health."

(f)    A testimonial from a customer named "Joan R." stating: "Dr Dubick is concerned about his patients. He really listened and cared."

(g)    A zip code.

*Id*. ¶ 33. *See also* R. 153, Exh. B.

Throughout the negotiations, the salespeople made several promises to Dubick. First, they promised that the Yellowbook advertisements would be identical or substantially similar to the Lakeview Directory advertisement. *Id*. ¶ 24. Dubick responded by explaining to the salespeople that he was in the process of updating his headshot. R. 147 ¶ 24. The salespeople promised that they would obtain the new headshot before publishing the Northside advertisement. *Id*. ¶ 28. They also promised that Yellowbook would forward proofs of the advertisement (that is, the test mock-up of the ad) to Dubick before publication. *Id*.

Second, the salespeople promised Dubick that for the quoted price, Yellowbook would publish the Northside advertisement in two separate locations: under the

2

"Chiropractors" heading and under the "Massage Therapeutic" heading.[2] *Id*. ¶ 25. An Internet listing would also be included. *Id*. The salespeople promised that publishing the advertisement under these headings would produce greater revenues than the Lakeview advertisement. *Id*.

Third, the salespeople promised that if Dubick purchased a Yellowbook advertisement, he would gain dramatic increases in revenue. *Id*. ¶ 27. To help persuade Dubick, the salespeople used a "Return On Investment" calculation. R. 120 ¶ 6. The investment-return calculation is based off of Northside's business information (solicited from Dubick) and relies on certain assumptions and projections that ostensibly prove that a Yellowbook advertisement will pay for itself overnight. *Id*. The salespeople also claimed that if Dubick failed to buy an advertisement, he would suffer substantial economic harm. R. 147 ¶ 27. The salespeople used a so-called "reverse" calculation to show that Dubick would lose massive business opportunities if he failed to buy a Yellowbook advertisement. R. 120 ¶ 6.

Based on these promises, Dubick agreed to buy advertising with Yellowbook. R. 147 ¶ 30. Dubick was then presented with a contract, R. 153, Exh. C, that supposedly embodied all the promises the salespeople made during the negotiations. *Id*. The front of the contract listed Dubick's order information and provided a space for Dubick's signature. R. 153, Exh. C. The back of the contract contained a 2,500 word "Terms and

---

[2]Although not explicitly stated in the Amended Complaint, R. 147, it appears that one of the headings was free of charge, as part of the Early Decision Incentive Reward by Yellowbook. R. 120 ¶ 4.

Conditions" section. *Id; see also* R. 120 ¶ 4(f). This section included the following five provisions:

> "Publisher will endeavor to furnish proofs of new and revised display print advertisements, but failure to do so will not relieve Customer of its obligations under this agreement." R. 153, Exh. C at 2 § 7(A).

> "Publisher will determine all headings that appear in its directories . . . Publisher does not guarantee the position of an advertisement under a particular heading. Failure to publish an advertisement in a particular position shall not be the basis for a claim or adjustment to the amount owed by Customer." *Id*. § 7(C).

> "In no event will Publisher . . . be liable to Customer for any other damages including . . . claims based on breach of contract . . . or rights arising from statutory enactment." *Id*. § 7(E).

> "Customer acknowledges that publisher shall retain any deposit, which will be applied to any future print services or Internet Services purchased by Customer, within two years from the date of this agreement. At the end of such two-year period, Customer will forfeit any right to apply the deposit to future print services or Internet Services." *Id*. § 8.

> "The signer of this agreement does, by his execution personally and individually undertake and assume the full performance hereof including payments of amounts due hereunder." *Id*. § 15(F).

The salespeople did not explain these five provisions, nor did they explain any of the other Terms and Conditions. R. 147 ¶ 29. Instead, the salespeople implored Dubick to pay a deposit in order to reserve space in Yellowbook. *Id*. ¶ 28. According to Dubick, these five provisions negated elements of his verbal agreement with the salespeople. R. 120 ¶ 4(g). Unaware of these provisions, Dubick signed the contract and paid a deposit of $549 (equal to the cost of one month of advertising) to reserve his advertisement. R.147 ¶¶ 29-30.

4

The advertisement was eventually published without Dubick submitting any proofs of the ad back to Yellowbook. R. 147 ¶ 31. The parties dispute whether Yellowbook requested proofs from Dubick, *Id.*, R. 137 at 7-8, but there is no dispute that Dubick was unhappy with what was eventually published in Yellowbook. The Yellowbook advertisement was missing elements that were included in the Lakeview advertisement. R.147 ¶ 33. Specifically, it was missing Dubick's name and picture; Northside's logo and zip code; the customer testimonial; and other statements that were included in the Lakeview advertisement. *Id.* Moreover, Yellowbook apparently published the advertisement under the "Massages - *Non*-Therapeutic" (emphasis added) heading instead of the "Massages - Therapeutic" heading. *Id.* ¶ 34. Non-therapeutic services are less reputable, according to Dubick, and therefore, the incorrect listing caused damage to Northside's image and reputation. *Id.* Dubick believes that the erroneous placement, along with the deficient advertisement, caused Northside to suffer substantial business losses. *Id.* ¶¶ 37-38.

In June 2009, Dubick and Northside filed this class-action lawsuit against Yellowbook in the Circuit Court of Cook County. R. 1, Exh. A. Yellowbook removed the case to federal district court shortly afterwards. R. 1. Dubick has since amended the complaint, R. 147, and has filed a motion for class certification, R. 120. That motion is now fully briefed before this Court.

## II.

Courts usually should decide the question of class certification before turning to the merits of a given action. *See Weismueller v. Kosobucki*, 513 F.3d 784, 786–87 (7th Cir.2008). To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as one subsection of Rule 23(b). *See Harper v. Sheriff of Cook Co.*, 581 F.3d 511, 513 (7th Cir.2009); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir.2006). "Failure to meet any of the Rule's requirements precludes class certification." *Harper*, 581 F.3d at 513 (quotation marks omitted) (quoting *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir.2008)).

"A class may be certified only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.*" Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 916 (7th Cir.2011) (emphasis added by *Creative Montessori* ) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)). The named plaintiff bears the burden of showing that each requirement is satisfied. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir.1993). The Court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir.2010) (citing *Szabo v. Bridgeport Machs.*, 249 F.3d 672, 676 (7th Cir.2001)); *see also Dukes*, 131 S.Ct. at 2551 (class certification analysis "[f]requently ... will entail some overlap with the merits of

the plaintiff's underlying claim"). The Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Chavez v. Ill. State Police*, 251 F.3d 612, 619 (7th Cir. 2001).

## III.

## A.

The threshold question is whether Dubick's proposed class is ascertainable. A plaintiff must show that the class is indeed identifiable as a class and definite enough that it can be ascertained. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006). In the class certification motion, Dubick describes the putative class as those who:

(a) after being beguiled and misled by Yellowbook sales personnel with false promises and material misrepresentations;

(b) were fraudulently induced to make purchases of Yellowbook print display advertising, with placement of advertising in one or more Yellowbook directories distributed within the State of Illinois;

(c) signed sales agreements or contracts containing terms substantially similar to those signed by the named Plaintiffs;

(d) made complaints or claims concerning Yellowbook's failure to properly publish and provide the requested advertising services that conformed to advertising requirements that were agreed upon by such persons and Yellowbook; and

(e) were denied full refunds, or appropriate compensation for the damages sustained as a result of Yellowbook's failures and misconduct.

R. 120 ¶ 10. The question this Court faces at the outset is whether this class definition, comprised of the five parts quoted above, describes an ascertainable class.

Yellowbook argues no, for three reasons. First, the Court cannot possibly identify those who are "beguiled and misled," R. 120 ¶ 10(a), without examining

7

individual subjective beliefs and expectations of the class members. R. 137 at 21. Second, oral contracts, R. 120 ¶ 10(d), between customers and Yellowbook's sales representatives are never identical but instead "vary like snowflakes." R. 137 at 22. Third, ascertaining the customers who were denied "appropriate" compensation, R. 120 ¶ 10(e), would require thousands of individualized and subjective inquiries. R. 137 at 22.

Dubick responds by arguing that the class is ascertainable if the Court draws "reasonable inferences" against Yellowbook. R. 148 at 15-21. He argues that these inferences are justified for three reasons. First, Dubick argues that discovery was limited in a way such that he was only able to obtain a small percentage (1.5%) of all potential claims, and thus the claims in the record are unrepresentative and are skewed in favor of Yellowbook. *Id.* at 16. Second, Dubick objects to Yellowbook's method of categorizing customer complaints because the categories mask and obscure many of the more serious complaints. *Id.* at 17-19. Third, Dubick believes that Yellowbook can provide, but refuses to do so, the contact information of all complaining customers who did not receive full refunds. *Id.* at 20.

The Seventh Circuit has held that "there is a 'definiteness' requirement implied in Rule 23(a)," *Alliance to End Repression v. Rochford,* 565 F.2d 975, 977 (7th Cir. 1977), that is, the proposed class must describe an ascertainable class. Indeed, each of the threshold prerequisites for class-action certification in Rule 23(a)(1) refers to a "class," and thus each prerequisite cannot be evaluated if the class is itself not ascertainable. *See* Fed. R. Civ. 23(a)(1) (numerosity of the "class"), (a)(2) (law or fact

8

questions common to the "class"), (a)(3) (typicality of claims or defenses of the "class"), (a)(4) (adequacy of proposed class representatives to protect the interests of the "class").

Beyond being required for evaluation of the Rule 23(a) prerequisites, the ascertainability requirement serves several purposes. First, it alerts the parties and the Court to the burdens that identification of the class might entail, which is relevant to whether the proposed class action is manageable. *Simer v. Rios*, 661 F.2d 655, 670 (7th Cir. 1981). "In this way the court can decide whether the class device simply would be an inefficient way of trying the lawsuit for the parties as well as for its own congested docket." *Id.* Second, ascertaining a definite class ensures that parties actually harmed by the defendants' conduct will be the recipients of the relief eventually awarded. *Id.* Additionally, a class definition cannot turn on "a future decision on the merits" (such as customers who were "beguiled and misled" by false representations, R. 120 ¶ 10(a)) because there would be no way to identify the class members until the case is resolved on the merits:

> Using a future decision on the merits to specify the scope of the class makes it impossible to determine who is in the class until the case ends, and it creates the prospect that, if the employer should prevail on the merits, this would deprive the judgment of preclusive effect: any other former worker could file a new suit, given that the losing "class" lacked any members.

*Bolden v. Walsh Constr. Co.*, – F.3d –, 2012 WL 3194593, at *2 (7th Cir. Aug. 13, 2012).

Here, the Court agrees with Yellowbook that Dubick's proposed class definition does not generate an ascertainable set of class members, at least not one that can be identified without a future decision on the merits. The prime example of this flaw is

Paragraph (a) of the proposed class definition, that is, those customers who were "beguiled and misled by Yellowbook sales personnel with false promises and material misrepresentations." The customers described in Paragraph (a) are those customers who were, by definition, defrauded. Thus, Paragraph (a) uses a future decision on the merits—was the particular customer defrauded—to specify the scope of the class.[3] That way of specifying the class's scope is prohibited.[4]

There is another problem with the class definition, this time in Paragraph (e), which seeks to include customer who "were denied full refunds, or appropriate compensation for the damages sustained as a result of Yellowbook's failures and misconduct." R. 120 ¶ 10. Using a term like "appropriate" in a class definition is a red-flag that, once again, a ruling on the merits is being used to determine the scope of the class. In order to determine whether a particular customer was in the class, the Court would have to make a highly individualized inquiry that depends on what terms were agreed upon, whether and how Yellowbook breached that contract, and what Yellowbook specifically offered to the customer.

Contrary to Dubick's argument, the flawed class definition cannot be cured by simply drawing reasonable factual inferences against Yellowbook.[5] The flaws are

---

[3]The same flaw is found in Paragraph (b) of the class definition: those customers who were "fraudulently" induced to buy Yellowbook's display advertising.

[4]What's more, the definition uses the term "beguiled," which is not exactly a concrete term that can be readily used to determine who is in the class and who is not.

[5]Dubick's argument that he is entitled to inferences in his favor is puzzling. He argues that this Court has "recognized that Yellowbook's unreasonable obstruction of discovery may be a factor to consider on this motion, and expressly told Yellowbook that obstruction of

inherent in the proposed class definition, and are not merely problems with the factual basis for the certification motion. Thus, the Court denies Dubick's motion for class certification. For the sake of completeness, the Court also will address Rule 23(a)'s requirements as if Dubick had proposed an ascertainable class.

## B.

### 1.

Before examining in detail whether Dubick has offered sufficient facts to satisfy the requirements of Rule 23(a), the Court will first address whether a recent Supreme case, which interpreted the commonality requirement, applies to this case. *Wal–Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011). *Dukes* held that, in order to satisfy the commonality requirement, the class-wide proceeding must be capable of generating "common answers apt to drive the resolution of the litigation." *Id.* Here, Yellowbook argues that Dubick has failed to meet the commonality requirement because the proposed class would not create questions that have common answers. R. 137 at 23.

Dubick counters with two arguments. First, courts have explained that the commonality requirement is "easily surmounted." R. 148 at 25 (citing *Kaufman v. American Express Travel Related Services Co., Inc.*, 264 F.R.D. 438, 442 (N.D. Ill.

---

discovery may support this Court's drawing inferences . . . ." R. 148 at 3. It is true that, during a motion hearing, the Court stated that it might draw negative inferences in deciding the class certification motion. R. 103, 04/28/11 Tr. at 4. But this Court explained that negative inferences could possibly be drawn *against the party* that the magistrate judge finds at fault for failing to provide discovery. *Id.* Eventually, the magistrate judge found that neither party was at fault. R. 105, 05/03/11 Tr. at 45. And Dubick never did actually appeal any of the magistrate judge's discovery rulings to this Court. So Yellowbook's conduct during discovery does not provide a basis to draw inferences in Dubick's favor.

2009)). Second, *Dukes* does not apply here because the commonality discussion there related only to cases involving injunctive relief under Rule 23(b)(2). R. 148 at 25. Here, the class action is based on Rule 23(b)(3), and thus (according to Dubick) the class is not subject to the requirements set forth in *Dukes. Id.*

That is incorrect. *Dukes* interpreted the commonality requirement of Rule 23(a)(2)—which applies to *all* class actions. 131 S. Ct. at 2550-51. The text of the rule sets forth 4 prerequisites that must be satisfied before any case may be certified. Fed. R. Civ. P. 23(a)(1)-(4). Not surprisingly, then, the Supreme Court stated that "[a] party seeking class certification must affirmatively demonstrate . . . common questions of law or fact . . . ." *Id.* at 2551. The opinion (like the Rule itself) contains no language limiting the commonality requirement to injunctive relief cases.

Dubick believes that footnote 2 of the Supreme Court's decision establishes that *Dukes* does not apply to non-injunctive relief classes. R. 148 at 31-32. That footnote reads, in pertinent part:

> Rule 23(b)(3) states that a class may be maintained where "questions of law or fact common to class members predominate over any questions affecting only individual members," and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy." The applicability of these provisions to the plaintiff class is not before us.

*Dukes*, 131 S. Ct. at 2549 n.2. But that language does not exempt non-injunctive relief cases from Rule 23(a)(2). All class actions must satisfy both Rule 23(a) and Rule 23(b). The Supreme Court was simply explaining the Rule 23(b) requirements, which did not change the fact that *all class actions*—including those based on Rule 23(b)(3)—must meet the requirements of Rule 23(a): numerosity, typicality, adequacy, *and*

commonality. *Id*. at 2548. And for class-action certification to be proper under Rule 23(b)(3), the common questions of law or fact must "predominate" over individual questions, and class treatment must be "superior" to other methods of adjudication. As explained below, for each of the types of claims that Dubick asserts, at least one of the Rule 23 requirements are not met.

**2.**

**a.**

Dubick's first claim is that Yellowbook misled customers by offering them a free reward, under what was called the Early Decision Incentive program, to induce the customers to buy advertising. For example, Yellowbook would offer an additional free ad under another heading. R. 120 ¶ 4(c). According to Dubick, the reward is really illusory because customers have no remedy if the free reward is inadequate. *Id*. Specifically, Dubick objects to two policies (embodied in the Terms and Conditions of the contract signed by customers) that declare that (1) if the paid-for advertisement is defective, the Incentive Reward's value is credited to the customer as an adjustment; and (2) customers receive no credit if the reward itself was defective. *Id*. According to Dubick, those policies contradict the verbal agreements between Yellowbook and customers, and thus there exists a class of aggrieved customers who were denied Incentive Rewards to which the customers were rightfully entitled. *Id*. ¶ 4.

But the first Rule 23(a) requirement—numerosity—has not been met. To certify a class action, the evidence must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Courts have also found the

13

numerosity requirement satisfied where the putative class would number less than forty individuals." *E.g., McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002). Dubick argues that numerosity is satisfied because Yellowbook has admitted that dissatisfied customers have filed over 10,000 claims in all. R. 123 at 3. Dubick then goes on to break down the number of claims due to problems with display artwork (1,800), text errors (1,950), or claims of general product dissatisfaction (383). *Id.*

But these numbers say nothing about how many customers were promised Early Decision Incentive Rewards only to later learn that they were not included in the contract. The record does not include evidence or any estimates of how many complaints are based on allegedly defective Incentive Rewards.[6] Yellowbook does not keep such specific records; that is, the descriptions Yellowbook uses to categorize customer complaints does not identify which complaints were based on an Incentive Reward. *See* R. 121, Exh. 18, 19. Nor do any of the notes taken down by the claims adjusters reference complaints about the Early Decision Incentive Program. R. 121, Exh. 32-37. Because there is no evidence showing how many complaints are based on the Incentive Rewards, Dubick cannot meet his burden to demonstrate numerosity.

Moreover, these Incentive Reward claims do not meet the predominance requirement for Rule 23(b)(3) class actions. The predominance requirement is similar

---

[6]It is true that Yellowbook's salespeople receive training on using the Early Decision Incentive Program during the sales pitch. R. 122, Exh. 16 at 7-8. That suggests that some customers, probably many customers, received an Incentive Reward, or at least the offer of one. But Dubick has failed to provide evidence that there were sufficient *complaints* based on the Incentive Reward.

to Rule 23(a)(3)'s typicality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 n.18 (1997). Despite the similarity, "the predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement." *Id.* at 624. The Court must compare the role of common issues of law and fact with the role of individual issues, including whether individual transactions must be examined in adjudicating the claim. *Lady Di's, Inc. v. Enhanced Servs. Billing*, 654 F.3d 728, 738 (7th Cir. 2011).

Here, the individualized details of each customer agreement would predominate over common questions. The record shows that the Early Decision Incentive Reward could take many different forms. Yellowbook might have offered customers other headings, coupons, color advertising, other directories, or a host of other benefits. R. 122, Exh. 16 at 8. A customer who signed up with Yellowbook based on an Incentive Reward that included a discount coupon, for example, might have to show that she never received the coupon. A customer who received an Incentive Reward with color advertising might have to show that the printed listing contained incorrect colors. These are individualized issues that would predominate over any common issues, as far as the record discloses. The class-treatment evaluation might be different if the record evidence showed that Yellowbook rarely performed on promised Incentive Rewards, so that the central dispute would be over whether a complete non-performance of the Incentive Reward is a permissible basis for liability. But that is not what the record shows. Indeed, even if liability could be answered across-the-board, questions of individual damages would also predominate. Yellowbook's claims-resolution process is flexible and allows different customers to obtain different

15

remedies and solutions to their complaints. R.137, Exh. E. The example that Yellowbook raises is illustrative: a claim for the same customer for the same error resulted in varying adjustments. R. 137, Exh. 1 ¶¶ 19-27. Dubick concedes that there are many individual issues on damages, but argues that the Court can use methods such as "bifurcating liability and damages trials, appointing a magistrate judge or special master to preside over individual damages proceedings, decertifying the class after the liability trial and providing class notice to members concerning how they may proceed to prove damages, creation of subclasses, or altering or amending the class." R. 148 at 46. But none of those mechanisms surmount this hurdle: Rule 23(b)(3) requires that common questions predominate in order for class-action treatment to be authorized.

### b.

Similarly, the claims relating to the Return-On-Investment calculations fail to raise common issues that predominate. It is true that Yellowbook provided training materials to its sales force in the hopes that they would use the calculations to convince prospective customers to buy an advertisement. R. 122, Exh. 16 at 4. That would seem to suggest that at least some sales representatives used them in their sales pitches. But just because a customer heard the calculations in the sales pitch does not mean that the customer actually relied on them in deciding to buy Yellowbook advertising. Indeed, the record does not contain evidence demonstrating that a substantial number of customers complained about the Return-On-Investment calculations. Instead, the parties would have to conduct an individualized inquiry to determine the identity of

16

those who actually believed and relied on the Return-On-Investment calculations, and that customer-by-customer inquiry would predominate over any common issues. Again, this might be a different case if there were some reason to believe that the Return-On-Investment calculation was the central selling point to customers, but there is no reason to think that is true.

### c.

Dubick also cannot show the predominance of the claim that Yellowbook allegedly failed to obtain Dubick's approval on proofs of the advertisement (that is, the test mock-up of the ad) before publishing the ad. The first problem is that an individualized inquiry would be needed to determine the proofing process for each customer. To be sure, there is some evidence that some salespeople verbally promised that proofs would be sent to the customer for approval because three of the sample customer complaints note that some customers complained about the proofing process. *E.g.*, R.122, Exh. 33, 35, 37. But there is no evidence that the process was widespread. For example, the sales pitch training materials did not include any slides or information on the proofing process.[7] R. 122, Exh. 13-16.

Second, not all complaints about the proofing process are similar because the factual basis for any given complaint is variable. For example, two of the three proof-related complaints in the record state that the customer never received a proof that he was promised. R. 122, Exh. 33 at 5, 37 at 12. But the third proof-related complaint, as

---

[7]And because the proofing process was not part of the sales training, this claim cannot meet the commonality requirement.

best as can be discerned, implied that a customer did send in a proof but Yellowbook misprinted the phone number. R. 122, Exh. 35 at 8. So even the proof-related complaints uncovered in discovery show that labeling a complaint with "proof-related" does not mean that a common question will predominate over individual ones.

### d.

Dubick's final type of claim, that Yellowbook used a "sham claim adjustment practice" to mollify and retain customers, R.120 ¶¶ 7-9, also fails the predominance requirement. According to Dubick, Yellowbook gave out adjustments and allowances to customers based on the particular customer's perceived profitability, rather than based on whether Yellowbook was at fault. R. 120 ¶ 8. But, not surprisingly, there is substantial variation among customer complaints that lead to adjustments or credit. Yellowbook organized its customer-complaint system into 25 different error types and 56 root causes. R. 137, Exh. B-D. Moreover, the actual benefit customers receive for the same type of complaint varies widely. R.137, Exh. E. Yellowbook's training materials regarding the adjustment process advises adjusters to "[p]repare 2-3 adjustment offers" in order to leave "room for negotiating . . . ." *Id.* The variation is also due to Yellowbook giving front-line representatives the discretion to offer adjustments as they see fit. R. 137, Heron Decl. ¶ 7. With all of this variety in the adjustment process, no common issue predominates over the individual ones.

### 3.

For the sake of further completeness, the Court also notes that Dubick's claims are not necessarily typical of the class. To certify a class, the Court must determine that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The question of whether the plaintiff's claims are typical is closely related to the commonality inquiry. *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). A claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Id.* (citing *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)).

Because the class definition is overbroad (any false promise made to a customer), Dubick's particular claims are not necessarily typical of the class. The class (as defined by Dubick) would include anyone who was misled (or "beguiled") by any false promise made by Yellowbook. R. 120 ¶ 10(a). That group would include those customers with complaints against Yellowbook that have nothing to do with the Early Decision Incentive, the Return-On-Investment calculations, or the proofing-approval process. Because Dubick's case is based only on those three types of false promises (aside from the "sham" adjustment process), his claims would not necessarily be typical of those of the class members.[8]

---

[8]If Dubick had narrowed the class definition to those who had complaints related to those three alleged false promises, then typicality might be satisfied. But Dubick pursued a too-broad definition.

**4.**

One last note, again for completeness's sake. To obtain class certification, a plaintiff must also show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy of representation is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chicago Police Assn.*, 7 F.3d at 584, 598 (7th Cir. 1993); *see also Spano v. The Boeing Co.*, 633 F.3d 574, 586-87 (7th Cir. 2011).

Aside from the atypicality of the claims (discussed above), there is no particular reason to doubt Dubick's adequacy as a class representative. On adequacy of counsel, the extensive effort that Plaintiff's counsel has poured into this litigation and the filings is sufficient to demonstrate counsel's adequacy to represent a class (if it had met all the other requirements of certification). But that conclusion was not clear-cut, for three reasons. First, counsel plainly misinterpreted *Walmart v. Dukes*. As explained above, *Dukes*'s interpretation of the commonality requirement is directly relevant to this case, despite Plaintiff's counsel's arguments to the contrary. Second, it appears that counsel's filings skirted the Court's page limits: when filing the class certification motion, Dubick's brief, R. 123, was 14 pages, but the motion itself, R. 120, consumed another 14 pages and was filled with substantive argument (not to mention plentiful single-spacing). That amounts to 28 pages of briefing, well beyond the 15-page limit set by Local Rule 7.1. Third, Plaintiff's counsel tried to support declarations in an affidavit by citing to plainly inadmissible anonymous internet postings. R. 122, Exh. 19.

Nevertheless, these three concerns do not rise to the level that would disqualify counsel as inadequate.[9] If this case had been certified for class-action treatment, then the adequacy requirement would have been met.

## IV.

The Court denies Dubick's motion for class certification. R. 120. Because the Court has now relied on briefs and materials filed in support of, and in opposition to, the class certification motion, if a brief was sealed in its entirety, the filing party must now file a publicly-accessible version redacting only that information fitting the narrow categories of information deserving of under-seal status. *Baxter Int'l v. Abbott Laboratories*, 297 F.3d 544, 546-47 (7th Cir. 2002); *Union Oil v. Leavell*, 220 F.3d 562, 567-68 (7th Cir. 2000). The parties have until October 17, 2012, to file those publicly-accessible versions. Additionally, at the next status hearing, the parties should be prepared to discuss how to move forward with Dubick's individual claim.

ENTERED:

Honorable Edmond E. Chang
United States District Judge

DATE: August 29, 2012

---

[9]Yellowbook argues that Dubick's failure to disclose his engagement agreement with counsel means that Dubick cannot show adequacy. R. 137 at 38. The Court disagrees. Yellowbook has cited no binding authority that requires disclosure of such agreements in order to meet adequacy. Yellowbook did cite *In re Ocean Bank*, 2007 WL 1063042, at *6 (N. D. Ill. April 9, 2007), but there a provision in the agreement empowered the attorneys to decide whether or not to settle. The district court found that the provision made the plaintiff's interests antagonistic to the class interests, and determined that the plaintiff was inadequate. *Id.* The court did not hold that engagement agreements must be disclosed in order to prove adequacy.

21