| | | |
|---|---|---|
| NORTHSIDE CHRIOPRACTIC, INC., and MICHAEL DUBICK, | ) ) ) | |
| Plaintiff, | ) ) | No. 09 C 04468 |
| v. | ) ) | Judge Edmond E. Chang |
| YELLOWBOOK, INC., formerly known as Yellow Book Sales and Distribution Company, Inc., | ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

In August 2005, Dr. Michael Dubick purchased advertising space in Yellowbook, Inc.'s telephone directory on behalf of his practice, Northside Chiropractic, Inc. Based on his discussions with Yellowbook's sales representatives, Dubick believed that the advertisement would be based on his artist-designed copy and placed under particular headings in the directory. When the advertisement was ultimately published, however, it did not meet Dubick's expectations. Dubick[1] filed a class-action complaint in Illinois state court, alleging breach of contract and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* Yellowbook removed the case to federal court based on the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d). R. 1, Notice of Removal. Dubick moved to certify a class of those who were misled by Yellowbook's sales tactics.

---

[1]For convenience's sake, Dubick and Northside Chiropractic will be referred to collectively as "Dubick."

R. 120, Mot. Class Cert. That motion was denied.[2] R. 169, Order Denying Class Cert. Yellowbook now moves for summary judgment on Dubick's individual claims. R. 233, Mot. Summ. J. For the reasons discussed below, Yellowbook's motion is granted.

## I. Background

In deciding Yellowbook's motion for summary judgment, the Court views the evidence in the light most favorable to Dubick as the non-moving party.[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In August 2005, Dubick was approached by sales representatives from Yellowbook about advertising in Yellowbook's directory. PSOF ¶ 1. Until that time, Dubick had been running custom-designed advertisements for Northside Chiropractic in the Chicago-Lakeside Yellow Pages. *Id.* ¶ 3. Yellowbook's sales representatives told Dubick that advertising in Yellowbook would "generate far better sales results" than his Chicago-Lakeside advertisement. *Id.* ¶¶ 5-8. The sales representatives promised Dubick that the layout and contents of the Yellowbook advertisement would be substantially similar to the custom-designed Chicago-Lakeside advertisement and that they would send him proofs and final copy for approval before printing. *Id.* ¶¶ 11, 13. To further sweeten the deal, the salesman told Dubick that, if he

---

[2]Although the class was not ultimately certified, the Court retains subject matter jurisdiction under CAFA. *See Cunningham Charter Corp. v. Learjet, Inc.*, 592 F.3d 805, 806-07 (7th Cir. 2010) (holding that a denial of class certification does not affect federal jurisdiction for a case removed based on CAFA).

[3]Citation to the docket is "R." followed by the entry number and, when necessary, the page/paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Yellowbook's Statement of Facts) [R. 235]; "PSOF" (for Dubick's Statement of Additional Facts) [R. 259]; and "Pl.'s Resp. DSOF" (for Dubick's response to Yellowbook's Statement of Facts [R. 239]), followed by the paragraph number.

purchased an advertisement for the "Chiropractors" heading immediately, they would put his advertisement under the "Massage – Therapeutic" heading for no additional charge. *Id.* ¶ 7. But, according to the sales representatives, Dubick had to act fast. *Id.* ¶ 9. There was another chiropractor interested in the space. *Id.* In order to secure his spot, Dubick had to "sign an agreement and pay a deposit" immediately. *Id.* ¶ 10.

Dubick decided to go with Yellowbook. *Id.* ¶ 14. The sales representatives filled out a preprinted form on carbonless copy paper with Dubick's information. *Id.* ¶ 19-20. On the front of the form, there is a box with bold, capitalized text that refers to terms and conditions on the back of form. The box on the front of the form says:

> This constitutes our agreement for advertising with Yellow Book Sales and Distribution Company, Inc. in it's [sic] next edition of the above telephone directories. The signer agrees to the terms and conditions set forth herein and on the reverse hereof which the signer has read. Each directory is payable in 12 monthly payments and invoiced starting on publication of that directory. Monthly billing & payment privilege applies only to accounts with no past due balances. All other accounts are billed annually on publication.

R. 235-1, Def.'s Exh. A, Agreement Form at 35.[4] After the Yellowbook sales representatives filled out the form, Dubick signed it. PSOF ¶ 22. Underneath the signature line is bolded text that says, "Authorized Signature Individually and for the Company" followed by another reference to the reverse side, "(Read clause 15F

---

[4]Because the agreement forms do not include page numbers, the Court will refer to the pagination of the .pdf in the CM/ECF entry.

on the reverse side)," this time in normal typeface. Agreement Form at 35.[5] Dubick

signed the form on the signature line and paid a $549 deposit. *Id.*; PSOF ¶¶ 22, 25;

Pl.'s Resp. DSOF ¶ 7. The sales representatives took the top copy of the carbonless

copy paper and left the customer copy with Dubick. *Id.* ¶ 23. The terms were on the

reverse side of both the original and customer copies. *Id.* ¶ 25. Dubick claims that

he was not shown and did not read the terms on the back of the form. *Id.* ¶¶ 26-27.

Those terms are now the subject of this lawsuit. On the reverse side of the

form, there are roughly 2,500 words of text broken into fifteen paragraphs.

Agreement Form at 32. The text, labelled "Terms and Conditions," explains that the

printed language "contains the entire understanding between the parties." *Id.* at 32,

¶ 12. Paragraph 7 of the agreement sets out the various rights and obligations of

the customer and the publisher. It says that "Customer must furnish all copy for

print advertising and/or Internet Services prior to the reasonable deadlines set by

Publisher. If Customer fails to do so, Publisher may make up and publish copy." *Id.*

at 32, ¶ 7A. For both new and revised print advertisements, "Publisher will

endeavor to furnish proofs" to the Customer, "but failure to do so will not relieve

Customer of its obligations under this agreement." *Id.* The agreement also says the

"Publisher, at its sole discretion, may refuse to publish an advertisement under a

particular heading and does not guarantee the position of an advertisement under a

particular heading." *Id.* at 32, ¶ 7C. "Failure to publish an advertisement in a

---

[5]Dubick's social security number appears on the Agreement Forms under the
signature line. If Dubick wishes to retroactively have those documents placed under seal,
then he may make a motion to do so.

4

particular position shall not be the basis for claim or adjustment to the amount owed by Customer." *Id.*

Paragraph 7 also purports to limit Yellowbook's liability: "Publisher's responsibility will be limited to an advertising allowance commensurate with the error, and in no event exceeding the price of the particular ad in which the error occurred." *Id.* at 32, ¶ 7D. The paragraph also provides that Yellowbook will not be liable to the customer "for any other damages including, but not limited to, alleged loss of business, revenues or profits or the cost of other forms of advertising." *Id.* at 32, ¶ 7E. This limitation applies to "claims based on breach of contract, tort (such as negligence) or strict liability, or rights arising from statutory enactment." *Id.* Finally, the agreement makes clear that the sales representatives are not authorized to make changes to the agreement's express, written terms. *Id.* at 32, ¶ 14.

Because he did not read these terms, Dubick believed that use of his ad copy and placement under his chosen headings were guaranteed. PSOF ¶¶ 29-31. Based on his conversation with the sales representatives, Dubick expected Yellowbook to contact him before the end of the year to get copies of his updated ad copy. *Id.* ¶ 12. He did not hear from them. *Id.* ¶ 16. It was not until he received the new Yellowbook directory in January 2006 that Dubick saw his advertisement. *Id.* ¶ 15. It did not meet his specifications. It did not include his name and title, his updated headshot, his logo, and various statements and slogans he had asked the sales representatives to include. *Id.* ¶ 17. And although the advertisement did appear

under the "Chiropractors" heading, it also appeared under the "Massage – *Non-Therapeutic*" heading instead of the "Massage – Therapeutic" heading. *Id.* ¶ 18 (emphasis added); R. 235-1, Def.'s Exh. C, Advertisement at 44-46. Non-therapeutic massage is often associated with "less professional and less reputable massage services." PSOF ¶ 18; *see also* Advertisement at 46 (advertising "Upscale Body Treatments For Professional Gentleman" and "Finest Female Masseuses" under the non-therapeutic massage heading).

Dubick, unhappy with the advertisement, complained to Yellowbook. PSOF ¶ 35. Yellowbook's customer-service representatives explained that, based on the terms and conditions that Dubick signed, the content of the advertisement was not guaranteed to match the customer's specifications. *Id.* They offered him a "goodwill" adjustment of ten to fifteen percent of the advertisement's cost, which Dubick did not accept. *Id.* ¶¶ 35-36. Instead, Dubick brought this lawsuit against Yellowbook, alleging breach of contract and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. Yellowbook now moves for summary judgment.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable

inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Breach of Contract

Dubick alleges that Yellowbook breached its contract with him by failing to print an advertisement that conformed to the specifications agreed to by the sales representatives. R. 147, Am. Compl. ¶ 49. Yellowbook argues that, based on the express terms of the written agreement, there was no breach, and, even if there had been a breach, Dubick's damages are limited to a refund of the $549 deposit (a remedy that he did not seek in his complaint, and does not mention in his brief). R. 234, Def.'s Br. at 5-10. Dubick responds that the written agreement is unconscionable and therefore unenforceable. R. 260, Pls.' Resp. Br. at 9-16. The

Court disagrees. Even when the facts are viewed in Dubick's favor, there is no basis to find that the contract is unconscionable.

Under Illinois law,[6] unconscionability can be procedural, substantive, or a combination of both. *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006). An agreement is procedurally unconscionable if "a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it." *Id.* Courts should evaluate "the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print." *Frank's Maintenance & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 410 (Ill. App. Ct. 1980); *see also Razor*, 854 N.E.2d at 622 ("A determination of whether a contractual clause is unconscionable is a matter of law, to be decided by the court."). A term is substantively unconscionable if it is "inordinately one-sided in one party's favor." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 267 (Ill. 2006) (citation omitted). The analysis often turns on "whether the terms themselves are commercially reasonable." *Frank's Maintenance*, 408 N.E.2d at 410. Based on the undisputed facts in the record, no reasonable factfinder could find that the terms of the agreement that Dubick signed were either procedurally or substantively unconscionable.

Dubick points to several features of the contract that he believes demonstrate procedural unconscionability. Pls.' Resp. Br. at 9-15. He argues that the contract

---

[6]The parties agree that Illinois law applies to the agreement, and the Court will proceed on that basis. *See Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 561 (7th Cir. 2001).

was a preprinted contract of adhesion; the limited-liability clause was not conspicuous and not bargained for; he was not directed to the clause limiting liability; the terms were on the back in fine print; there was no bold or all capital font identifying the limited-liability clause; and there were no headings identifying the limited liability clause. *Id.* But even taken together, these facts do not support a finding of procedural unconscionability. *See Kinkel*, 857 N.E.2d at 264 (stating that procedural unconscionability depends on the totality of the circumstances).

Dubick is correct that he signed a non-negotiable contract of adhesion written in fine print, but that alone does not compel the conclusion that it was procedurally unconscionable. *Kinkel*, 857 N.E.2d at 266 (noting that contracts of adhesion are "a fact of modern life," and "[i]t cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable"). Unlike many contracts of adhesion, which are dozens of pages long and loaded with fine print, the *entire* contract with Yellowbook was a *single* page and fewer than 2,500 words. Although the print was small and printed on carbonless copy paper, it was readable, as demonstrated by the exhibits filed with the briefs. In *Razor*, the Illinois Supreme Court found a warranty procedurally unconscionable where the customer *could not have read* the terms before signing the contract because it was in the glove compartment of a car that she had not yet received. 854 N.E.2d at 623. That is not this case. Even if the sales representatives had pressured Dubick to sign the contract that day, there is no evidence that he could not have easily read the terms of the agreement if he had simply chosen to do so. *See Kinkel*, 857 N.E.2d at 266

(distinguishing contract terms from those found in *Razor* because there was "no dispute that the terms and conditions were in [the consumer's] possession and she either read them or could have read them if she had chosen to do so").

Dubick's argument that he did not know the terms were there is also an unpersuasive reason to conclude that a reasonable factfinder could find unconscionability. Bolded, capitalized language on the front of the form directed him to the terms on the back, and one of the contract provisions was referenced directly under the signature line. Dubick relies on *Frank's Maintenance* for the proposition that the clause limiting liability must be part of a prior course of dealing, bargained for, or conspicuous to be effective. Pls.' Resp. Br. at 9-11. He argues that the clause was not conspicuous because it was on the reverse side in fine print. *Id.* But in *Frank's Maintenance*, "the clause directing the [consumer's] attention to conditions on the reverse side of the acknowledgment" was not conspicuous because it "was stamped over, indicating that [it] was irrelevant." 408 N.E.2d at 411. Here, the legend directing Dubick to the terms on the reverse was not obscured in any way, and there was another reference to a reverse-side term immediately below where he signed the document. Again, there is no dispute that the terms were in Dubick's possession and he could have read them if he had chosen to do so. *See Kinkel*, 857 N.E.2d at 266. Based on the facts before the Court (all of which are undisputed for the purposes of this motion), no reasonable factfinder could determine that this contract was procedurally unconscionable.

Nor is the contract substantively unconscionable. A contract or term is substantively unconscionable if it is "commercially unreasonable", *Frank's Maintenance*, 408 N.E.2d at 410, or so "grossly one-sided" that "only one under delusion" would enter into it, *Kinkel*, 857 N.E.2d at 269. Dubick argues that a contract that limits liability so drastically meets this standard. But the Illinois Supreme Court has found that a similar exculpatory clause in a contract for telephone-directory advertising is not unconscionable. *McClure Eng'g Assocs., Inc. v. Reuben H. Donnelly Corp.*, 447 N.E.2d 400, 402 (Ill. 1983). Limiting liability to, at most, the price paid is not so outrageous that any party entering into such an agreement must be delusional, particularly given how difficult it is to quantify other forms of damages (like lost business).

Because the written contract is not unconscionable, the terms of that contract control the resolution of Dubick's breach-of-contract claim. Agreement at 32, ¶¶ 12, 14 (stating that the written terms embody the entire agreement between the parties and that sales representatives may not modify the agreement). The written terms limit Yellowbook's liability to "an advertising allowance commensurate with the error, and in no event exceeding the price of the particular ad in which the error occurred." *Id.* at 32, ¶ 7D. The contract further states that Yellowbook is not liable for any other damages arising from contract, tort, or statute. *Id.* at 32, ¶ 7E. Although they are disfavored, limited-liability and exculpatory clauses of this nature will be enforced in Illinois unless they violate public policy. *See Hicks v. Airborne Express, Inc.* 858 N.E.2d 48, 54 (Ill. App. Ct. 2006). Clauses limiting

liability in contracts for telephone-directory advertising do not violate the public policy of Illinois. *McClure Eng'g.*, 447 N.E.2d at 402 (holding that an exculpatory clause in a contract for telephone-directory advertising did not violate the public policy of Illinois). So, based on the express language of the contract,[7] Yellowbook can only be liable for an advertising credit up to the cost of the advertisement—in this case, $549.

In his complaint, Dubick does not ask the Court for the relief allowed under the contract. Am. Compl. ¶¶ 52, 62. And, although he was put on notice of the limitation provision in Yellowbook's motion for summary judgment, Dubick did not request this relief—even in the alternative—in his response to the motion for summary judgment. *See generally* Pls.' Resp. Br. It is true that relief need not be pled to be available, Fed. R. Civ. P. 54(c), but Dubick was faced with a motion for summary judgment that flagged the precise issue, and yet Dubick did not resist it on the ground that the ad-credit relief required denial of judgment. (Perhaps Dubick believes that the claim is not worth pursuing if the credit is the only relief he can obtain.) Because the express terms of the written agreement foreclose the relief that Dubick seeks, his breach-of-contract claim cannot survive.[8] Yellowbook's motion for summary judgment on this claim is granted.

---

[7]Despite Dubick's very brief argument that the language of this provision "hardly an instance of unambiguous language," Pls.' Resp. Br. at 6, the Court finds that subparagraphs 7D and 7E clearly limit Yellowbook's liability to a maximum of the advertisement's cost. And, in any event, undeveloped arguments are waived. *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008).

[8]Because the limitation of liability requires summary judgment in favor of Yellowbook on the contract claim, there is no need to decide whether there was a breach of the agreement's other terms. It is worth noting, however, that the plain, unambiguous

## B. Illinois Consumer Fraud Act

To demonstrate a deceptive practice under the Illinois Consumer Fraud Act, Dubick must show: "(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the deception occurred in the course of trade or commerce; and (4) the consumer fraud proximately caused the plaintiff's injury." *White v. DaimlerChrysler Corp.*, 856 N.E.2d 542, 546 (Ill. App. Ct. 2006) (citation omitted). But "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005) (citations omitted). Yellowbook argues that Dubick's claim under the Illinois Consumer Fraud Act is essentially a claim for breach of contract, and must therefore be dismissed. Def.'s Br. at 10-12. To be sure, there is some overlap, but Yellowbook's argument misunderstands Dubick's claim. The core of Dubick's Consumer Fraud Act claim is not based on the terms of the written agreement. Instead, he argues that Yellowbook's sales representatives use deceitful and misleading tactics to lure customers into signing the agreement without reading the fine-print agreement. *See* Pls.' Resp. Br. at 16-17; Am. Compl.

---

language of Paragraph 7C makes clear that Yellowbook does not guarantee the placement of an advertisement under a particular heading. Dubick's attempt to use extrinsic evidence to create ambiguity is not permitted under Illinois law. *See Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (holding that extrinsic evidence may only be admitted when an ambiguity exists). Whether Paragraph 7A was breached is less clear. It is feasible that the paragraph creates an obligation for Yellowbook to set reasonable deadlines for a customer's submission of advertising copy. According to Dubick, Yellowbook did not set any deadlines or communicate with him after the sales call. PSOF ¶¶ 15-16. It is therefore possible that Yellowbook breached Paragraph 7A, but because of the limitation on liability, any such breach is not relevant to the resolution of the motion for summary judgment.

¶¶ 53-62. More specifically, Yellowbook misleads its customers by suggesting that the deal between the parties embodies certain terms, then dupes them into signing a contract that does not contain those terms. Am. Compl. ¶ 57. The Consumer Fraud Act count is not simply a repackaged breach-of-contract claim, it rests upon the allegedly misleading sales tactics of Yellowbook's sales staff. But, even assuming that Yellowbook uses these deceptive sales practices (as the Court must in the summary-judgment stage), Dubick cannot show that these practices proximately caused his injury. *See Oliviera v. Amoco Oil Co.*, 776 N.E.2d 151, 155 (Ill. 2002) (holding that there is a proximate cause requirement under the Act).

Dubick's claim essentially alleges two tactics that he believes are deceptive: (1) Yellowbook's sales representatives promise that advertisements will conform to the customer's specifications, knowing that the contract makes no such guarantee and disclaims most liability; and (2) the sales representatives tell the customer that they must immediately sign the invoice in order to reserve a spot in the directory.[9] Am. Compl. ¶¶ 54-57. To meet the proximate cause requirement under the Act, Dubick must "show that the[se] misrepresentations proximately caused his damages." *Ryan v. Wersi Elec. GmbH and Co.*, 59 F.3d 52, 54 (7th Cir. 1995). Dubick argues that he was harmed when Yellowbook published an advertisement that did not conform to his specifications. PSOF ¶¶ 33-34 (stating that he received

---

[9]In his response brief, Dubick points to Yellowbook training materials that encourage sales representatives to get customers to sign the invoice before telling them about the non-refundable deposit. PSOF ¶ 42. But Dubick does not claim that he was tricked into paying the deposit by Yellowbook's concealment that a deposit would be needed. In fact, he states that the sales representatives did tell him *before* signing that he would need to put down a deposit. *Id.* ¶ 9. This allegedly deceptive practice is therefore not relevant to Dubick's Consumer Fraud Act claim.

fewer referrals from the Yellowbook advertisement). Therefore, to properly demonstrate proximate cause, Dubick must connect the sales representatives' deceptive practices to the publication of the non-conforming advertisement.

Dubick claims that the sales representatives' misrepresentations caused him to sign up with Yellowbook and discontinue his advertisement in another directory. PSOF ¶ 14. But simply signing with Yellowbook was not the cause of his damages; Dubick claims that he was harmed when Yellowbook published an advertisement that did not include all the features that Dubick wanted. Dubick's critical action, then, was signing the contract that allowed Yellowbook to publish an advertisement that did not conform to his specifications. Dubick claims that he would not have signed with Yellowbook if he knew what he was signing, Pls.' Resp. Br. at 22-23— but Dubick would have known what he was signing if he had just turned the invoice over to read the one-page agreement. So, to demonstrate that the tactics used by Yellowbook's sales proximately caused his damages, Dubick must show that *because* of these tactics, he did not turn the form over to read the terms and conditions.

Dubick has not made this showing. Dubick does say that he relied on the sales representatives' statements that the advertisement would meet his specifications, PSOF ¶ 14, but he fails to connect this reliance to his failure to read the terms that the sales representatives gave him to sign. If, for example, Dubick could point to affirmative, deceptive statements by the sales representatives to the effect of, "the terms say what I just told you," he might have created a genuine issue of fact as to the cause of his damages. Even if Dubick had merely testified or

declared that, because of the promises by the sales representatives, he did not read the agreement on the back, he might have made the necessary showing of proximate cause. He made no such declaration. Nor does Dubick say, let alone present evidence to suggest, that the sales representatives' statement that he had to act fast somehow prevented him from reading the one-page terms sheet. As discussed above, the agreement was fewer than 2,500 words on a single page. If the agreement were dozens of pages of fine print, perhaps the inference could be drawn that urging Dubick to act immediately would have prevented him from reading the agreement. But there can be no such inference on this record.

Moreover, Dubick presents an entirely different reason that he did not read the reverse-side of the agreement: he supposedly did not know it was there. PSOF ¶ 26. Dubick does not connect the sales representatives' deceptive tactics to his failure to see the agreement or the language on the front of the form referencing the reverse-side. He attributes his failure to see it on procedural unconscionability. Although hiding material terms or preventing a consumer from reading a contract could be a deceptive practice in itself, as discussed above, the contract was not procedurally unconscionable. Thus, on the record before the Court, the necessary connection between the cause of the harm (failure to read and understand the agreement) and the allegedly deceptive practices is entirely absent. Because Dubick has failed to show that the deceptive practices proximately caused his damages, Yellowbook is entitled to summary judgment on Dubick's Consumer Fraud Act claim.

## IV. Conclusion

For the reasons discussed above, Yellowbook's motion for summary judgment is granted for both claims.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: March 6, 2015